In the Matter of **WILCO FOREST MA-CHINERY, INC., Bankrupt.**

**A. Pope GORDON, Trustee of Wilco Forest Machinery, Inc., Bankrupt, Appellant-Cross Appellee.**

v.

**EATON CORPORATION et al., Appellees-Cross Appellants.**

No. 73-2118.

United States Court of Appeals, Fifth Circuit.

March 27, 1974.

Rehearing Denied June 13, 1974.

Oakley Melton, Jr., Montgomery Ala., for appellant-cross appellee.

Richard A. Ball, Jr., Montgomery, Ala., for appellees-cross appellants.

Before THORNBERRY, INGRAHAM and RONEY, Circuit Judges.

THORNBERRY, Circuit Judge:

A. Pope Gordon, as trustee in bankruptcy of Wilco Forest Machinery, Inc., initiated this action for the return of certain Wilco property presently in the possession of Eaton Corporation, Eaton Yale, Ltd., and Timberjack of Alabama, Inc. (hereinafter collectively denominated "Eaton"). The district court upheld the referee's finding that the security interest asserted by Eaton was valid, that its possession was not illegal as a preference under Section 60 of the Bankruptcy Act nor as a fraudulent transfer under Section 67d of that Act,

and that an accounting was required to insure that Eaton had not appropriated unsecured property for its own benefit to the detriment of the general creditors. Eaton appeals the requirement of an accounting, and Gordon appeals everything else. We affirm.

Wilco Machines, Inc., a Tennessee corporation, (hereinafter "Wilco") was engaged in the business of selling woodworking, heavy logging and forestry machinery. By the middle of 1969 the logging machinery sales division had become the most rapidly growing part of Wilco's business and had evolved into a separate arm of the company. Wilco ranked first in the United States in sales of heavy logging machinery made by Timberjack Machines, Ltd., a subsidiary of Eaton Corporation.[1]

Both Wilco and Timberjack were agreed that a better organized and financed sales organization was needed to take advantage of the sales opportunities offered by the growth of the timber industry and the use of heavier machinery. In accordance with a study by the Dealer Development Department of Timberjack Machines, Ltd., Wilco Forest Machinery, Inc. (WFM) was formed as a separate corporation on November 1, 1969, to be operated as a sales corporation under the terms of three documents—the Dealer Agreement, the Dealer Finance Agreement, and the Plan for Profit.

The Dealer Agreement outlined the general rights and duties of the parties, WFM and Timberjack Machines, Ltd. The Dealer Finance Agreement, signed a few months later, provided for the financing of WFM's dealership operations by Eaton Yale & Towne Canada, Ltd. (EYTC). It established two kinds of accounts between WFM and EYTC, current accounts payable and a debenture notes payable account. The current accounts payable covered floor plan purchases of Timberjack machinery, fleet rental purchases, and all other open account transactions. WFM was required to pay such accounts as they became due or to transfer them to the debenture notes payable account on a monthly basis and issue debenture notes to EYTC in settlement. The debenture notes were convertible into common stock of WFM at the option of EYTC. The notes were covered by a security interest under Article 9 of the Uniform Commercial Code in all cash accounts, all inventory accounts including rental fleet units, all accounts receivable, and all asset accounts arising from collections of accounts receivable together with the proceeds of such assets. The Dealer Finance Agreement also contained extensive provisions giving EYTC control over certain aspects of the operation and financing of WFM's business. The Plan for Profit was a series of reports, analyses and projection sheets to be kept by WFM and forwarded regularly to EYTC, all of which were designed to create added incentive for sales of Timberjack machinery.

WFM experienced financial difficulties from the beginning of its existence as a separate corporate entity. The first audited financial statement, dated January 31, 1970, which covered the first three months of operation, showed a net operating loss of $24,869. By July 31, 1970, the total loss was up to $212,053.

---

1. The various Eaton enterprises involved are as follows:

    a. Eaton Corporation—The parent company, with its principal place of business in Cleveland, Ohio.

    b. Timberjack Machines, Ltd.—A Canadian subsidiary of Eaton Corporation. Its existence as a separate corporation was ended by merger on March 31, 1970.

    c. Eaton Yale & Towne Canada, Ltd.—Another Canadian subsidiary of Eaton Corporation. It was formed on March 31, 1970, by the merger of Timberjack Machines, Ltd., and five other Canadian corporations.

    d. Eaton Yale, Ltd.—The new name adopted by Eaton Yale & Towne Canada, Ltd.

    e. Timberjack of Alabama, Inc.—An Alabama corporation formed on June 9, 1971, as a subsidiary of Eaton Yale, Ltd. It was formed to repossess the bankrupt's property and continue its business, since Eaton Yale, Ltd., was not at that time authorized to do business in Alabama.

The next financial statement, made on March 31, 1972, showed assets of $1,555,123.84 and total liabilities of $1,994,916.29. The net operating loss for the eight-month period ending March 31, 1971, was $552,139.97. The debenture notes payable account had reached $900,000. In addition, there was a total of $617,629.82 listed under current accounts payable. A severe shortage of operating cash existed, due to the very high repossession rate, increasing inventory and climbing age of receivables.

EYTC knew of WFM's financial troubles from an early date. It periodically received copies of the audited financial statements, in addition to the various monthly reports submitted under the Plan for Profit. EYTC knew or should have known that WFM was insolvent, probably as early as June, 1970. In January, 1971, inventory discrepancies were discovered, later to be confirmed by the audit of march 31, 1971.

Shortly after the March 31 audit, Eaton Yale, Ltd., decided to exercise its option under the Dealer Finance Agreement and take over control of WFM. On May 4, 1971, $439,000 worth of debentures were converted into common shares of WFM, making Eaton Yale, Ltd., the majority shareholder. That same day all the officers and all the directors except R. O. Wilson resigned and were replaced by representatives of Eaton Yale, Ltd.

Prior to the conversion into common shares, $900,000 worth of debentures had been issued. In addition, WFM owed Eaton Yale, Ltd., $617,000 under current accounts payable. By a resolution of the old stockholders and directors of WFM, the corporation could not issue more than $925,000 worth of debentures. On the day of the takeover by Eaton Yale, Ltd., however, that limit was increased to $1,525,000. New debentures were then issued to cover the additional $617,000 debt.

On June 11, 1971, the officers installed by Eaton Yale, Ltd., closed down WFM for the stated purpose of trying to pull together the assets of WFM, to reach agreement with WFM's unsecured creditors, and to get the dealership off to a fresh start. A proposal was made to pay $164,988 in general unsecured debts with $64,593 in unencumbered assets. This proposed settlement of unsecured claims amounted to approximately thirty-eight cents on the dollar. It was rejected by the creditors, and the new officers promptly placed WFM in bankruptcy, filing the petition on July 19, 1971.

The WFM officers who placed it in bankruptcy were also officers, agents or employees of Eaton or some of its subsidiaries. Prior to filing the bankruptcy petition they organized Timberjack of Alabama, Inc. It was formed to repossess the collateral security claimed by Eaton Yale, Ltd. The actual repossession took place on June 8, 1971, although Timberjack of Alabama, Inc., was not formally incorporated until the following day.[2] The total value of the property repossessed was $705,394, including $466,084 in equipment and inventory, $81,310 in parts inventory, $6,981 in cash, $45,848 in cash from collections on accounts receivable, $98,171 in accounts receivable, and $7,000 in notes from corporate officers. These are the assets the trustee seeks to recover in this proceeding.

Gordon first contends that he was denied a hearing before the district court. This point is without merit. There was a lengthy discussion of the issues presented at the conference with the district judge attended by the referee and the attorneys for the parties. The district court's order is cast in gen-

---

2. Although Gordon assigns this as a reason for voiding the repossession, his point is not well taken. Assuming, *arguendo*, that Timberjack of Alabama, Inc., could not have validly possessd the assets prior to its date of incorporation, that technical difficulty was cured by its incorporation on June 9, 1971, after which time the corporation can be deemed to have adopted the repossession action, thus curing any problems regarding the lawfulness of its possession. H. Henn, Law of Corporations, § 111 (2d ed. 1970).

eral terms, but that is no reason to assume, as Gordon does, that the court did not consider all of the issues, particularly when the order specifically recites that the points raised by counsel have been carefully considered. The district court afforded Gordon a fully adequate hearing.

Gordon next contends that EYTC's security interest was not perfected because the financing statement was insufficient. The financing statement filed under the Alabama Uniform Commercial Code was signed on April 15, 1970, by Timberjack Machines, Ltd., as the secured party. However, that corporation's separate existence had been ended by the merger of March 31, 1970, which created Eaton Yale & Towne Canada, Ltd., by amalgamating Timberjack Machines, Ltd., with five other corporations. Since Timberjack Machines, Ltd., was no longer in existence when the financing statement was signed, Gordon argues that the statement was insufficient to perfect EYTC's security interest because it was not "signed . . . by the secured party" as required by statute. Code of Ala., Tit. 7A, § 9–402.

Under the Code, the financing statement serves merely to put inquiring creditors on notice of a prior security interest. Section 9–402, which sets out the formal requisites of a financing statement, also states that strict compliance with all the formal requisites is not necessary. "A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." Code of Ala., Tit. 7A, § 9–402(5). Courts have consistently upheld the validity of financing statements that provide reasonable notice, despite minor errors in the description of the collateral, In re Var-

ney Wood Products, Inc., 4 Cir. 1972, 458 F.2d 435, the name of the secured party, In re Colorado Mercantile Co., D. Colo.1969, 299 F.Supp. 55; In re Excel Stores, Inc., 2 Cir. 1965, 341 F.2d 961, or the address of the secured party, Silver v. Gulf City Body & Trailer Works, 5 Cir. 1970, 432 F.2d 992; In re King-Porter Co., 5 Cir. 1971, 446 F.2d 722; Rooney v. Mason, 10 Cir. 1968, 394 F.2d 250. The Alabama courts have adopted a similar liberal construction of § 9–402, approving financing statements that provide reasonable notice despite minor errors in the description of the collateral. Galleon Industries, Inc. v. Lewyn Machinery Co., 1973, 50 Ala.App. 334, 279 So.2d 137, cert. denied, 291 Ala. 779, 279 So.2d 142; Associates Capital Corp. v. Bank of Huntsville, 1973, 49 Ala.App. 523, 274 So.2d 80.

Despite the fact that Timberjack Machines, Ltd., had ceased its separate corporate existence at the time the financing statement was signed, the statement was sufficient to put potential creditors of WFM on notice of EYTC's prior security interest. Timberjack was still in business as a division of EYTC. The address for Timberjack listed in the financing statement, though different from that for the EYTC headquarters, was the proper address for the Timberjack division of EYTC and was the location of the records evidencing EYTC's security interest. The referee properly found that an inquiring creditor would have been put on sufficient notice by the financing statement. Therefore, the statement was sufficient to perfect EYTC's security interest.

Gordon next argues that the transfer to Eaton, via Timberjack of Alabama, Inc., of WFM assets was a voidable preference under 11 U.S.C. § 96(a)(1),[3]

---

3. 11 U.S.C. § 96. Preferred creditors
    (a)(1) A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

since the transfer "left only nominal assets for all the *other* 123 general creditors . . . ." (Emphasis added.) However, Eaton was not a general creditor, since it held a valid, perfected security interest in WFM's assets. Consequently, the transfer was not a preference, since it did not enable Eaton "to obtain a greater percentage of [its] debt than some other creditor *of the same class.*" 11 U.S.C. § 96(a)(1) (emphasis added).

While admitting that the transfer of assets properly subject to the security interest would not be a preference, Gordon does argue that there was a $461,000 limit on the amount of such assets, and that, since Eaton actually took $705,394 worth of assets, it is at least liable to return the $244,394 difference. His argument starts with the premise that there was a $925,000 limit on the debenture note program, which was imposed by the directors and shareholders of WFM. At the time of the May 4 takeover, EYTC held $900,000 worth of debentures, of which $439,000 was converted into common shares to effect the transfer of control to EYTC. After the takeover, the new directors and shareholders of WFM voted to raise the debenture ceiling and to issue an additional $617,000 of debentures to EYTC, since that was the amount then outstanding on WFM's current accounts payable to EYTC. Gordon argues that this new debenture issue was in violation of the previously approved limit and was thus insufficient to give EYTC any further security interest in WFM assets. If only $900,000 worth of debentures were properly secured, and if $439,000 of that was given up in exchange for common shares, Gordon reasons that EYTC had a maximum of $461,000 security interest properly remaining.

■ The flaw in this reasoning is that the WFM directors and shareholders had no power to impose any limit on EYTC's security interest in the first place. The security interest was created by the Dealer Finance Agreement, a contract between EYTC and WFM. It contained no such limit. Instead, it bound WFM either to pay the current accounts payable monthly or to transfer unpaid sums to the debenture notes payable account and issue secured debentures to cover those sums. WFM had no power unilaterally to avoid the requirement to issue secured debentures for the $617,000 worth of current accounts payable. In raising the debenture limit and issuing the additional $617,000 of secured debentures, the new directors and shareholders of WFM were doing no more than they were already contractually bound to do. Therefore, the new debentures gave Eaton a legitimate security interest, and its recovery by repossession of the collateral assets was not a voidable preference.

■ In re King-Porter Co., 5 Cir. 1971, 446 F.2d 722, provides an independent rationale for holding that there was no voidable preference here. That case involved the precisely analogous case of a bankrupt dealer and a security interest in his inventory in favor of his supplier that was created by an after-acquired property clause in the security agreement. The trustee there claimed, as does the trustee here, that the secured party's repossession of the collateral shortly before the bankruptcy petition was filed constituted a voidable preference. We noted that a transfer of property, to be a "preference," must occur within four months of the filing of the bankruptcy petition. 11 U.S.C. § 96(a)(1). The "property" in question is not the collateral but rather the secured party's security interest, and that interest is transferred once it is "so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee." 11 U.S.C. § 96(a)(2). Thus, for purposes of that section, a "transfer" is "equated with the act by which priority over later creditors is achieved and not with the event which attaches or perfects the security interest in a specific item of property." 446 F.

2d at 730. Therefore, the transfer of a security interest in after-acquired property occurs when the secured party completes the filing requirements under the Code. In this case, that occurred on April 15, 1970, which is more than four months before the filing of the petition for bankruptcy on July 17, 1971. Therefore, the statutory requirements for a preference are not met here.

 Gordon next argues that the transfer of WFM assets to Eaton is voidable as a fraudulent transfer under 11 U.S.C. § 107(d). Under the *King-Porter* case, however, the transfer involved here occurred when the filing requirements were met, which was over a year prior to the filing of the petition for bankruptcy. Therefore it was too remote in time to constitute a fraudulent transfer under 11 U.S.C. § 107(d).

Gordon's final complaint is that he has not been granted relief on equitable principles, as he should have been in view of Eaton's "inequitable" conduct in taking over WFM and manipulating its financial structure to Eaton's advantage. The referee did find that Gordon might be entitled to some relief, since the testimony indicated that Eaton

> intended to inherit whatever [it] possibly could from this bankrupt corporation not only in the way of shop machinery and equipment but in the way of real estate and good will, items in which [it] did not have a security interest.

In order to untangle Eaton's dealings with WFM, so as to assess accurately what relief might be appropriate, the referee ordered a full accounting of all assets recovered by Eaton between May 4, 1971, the day of the takeover, and June 19, 1971, the day the bankruptcy petition was filed. The accounting is also to take into account all other relevant transactions, including those between Eaton and Wilco which involved equipment and machinery later assigned to WFM.

 Gordon finds this inadequate, while Eaton complains of the expense involved in such a full accounting. It is obvious, however, that the referee must have the full picture before he can assess what, if any, relief should be granted. It would be premature to grant the further relief Gordon asks, in the absence of complete information. Considering the possibility of inequitable exploitation of Eaton's controlling position over WFM, however, it is only prudent to require such an accounting. The referee has chosen a very sensible approach to this very complicated and difficult problem.

Affirmed.